WILLIAM HENSCHEL

*v.*

FRANZ MAMERO.

*Filed at Ottawa May 12, 1887.*

1.  FRAUD—*release of mortgage—procured by fraud—set aside in equity.*
As a general principle, a release or discharge of a mortgage obtained through
mistake or fraud, will, as between the parties, be held inoperative, and no
defence to a foreclosure.

2.  So where the holder of a promissory note secured by a deed of trust
on property, is induced to surrender the note and release the security upon
the verbal agreement of the debtor that the creditor, his father-in-law, shall
enjoy the rents, issues and profits of the mortgaged premises during his life,
and have the property itself sold and the proceeds applied to his use, if re-
quired, which agreement is made by the debtor without any intention of per-
forming the same, and who refuses such performance, a court of equity will
set aside the release of the trust deed, and enforce payment of the note by a
sale of the property.

3.  Where a party repudiates his agreement, which is the sole considera-
tion for the release of a debt due from him, and a mortgage securing the
same, a court of equity, in order to prevent a failure of justice, will treat the
mortgage as still subsisting, and place the parties in the same position they
were before the release.

4.  TRUST—*legal title acquired by fraud.* Where a person acquires the
legal title to land or other property by means of an intentionally false and
fraudulent verbal promise to hold the same for a certain specified purpose,—
as, for example, a promise to convey the property to a designated person, or
to reconvey to the grantor, and the like,—a court of equity will fasten a trust
upon the property itself, and follow it into the hands of the wrongful owner.

5.  STATUTE OF FRAUDS—*as to a trust arising out of a fraudulent pro-
curement of the release of a mortgage.* Where the purchaser of property
induces his vendor to release his mortgage on the same for the purchase
money, by his false and fraudulent promise that the latter shall, during his
life, have the rents, issues and profits thereof for his support, made with the
intention not to perform the same, the Statute of Frauds will not apply, and
whatever rights the vendee thereby acquires at law, will be held by him, in
equity, in trust for the vendor.

APPEAL from the Appellate Court for the First District;—
heard in that court on appeal from the Superior Court of
Cook county; the Hon. H. M. SHEPARD, Judge, presiding.

Mr. THOMAS SHIRLEY, for the appellant:

Appellant never induced the appellee to release the trust deed. He executed such release on his own motion, to avoid the payment of a claim of Zipprich, and to prevent his wife from obtaining alimony.

The agreement to hold the property in trust, if ever made, was void under the Statute of Frauds. If the agreement is good in part, it is good as a whole, and Henschel could jointly set up, by way of defence, that the verbal trusts gave an estate to Mamero for life, with remainder to Henschel, and the latter should receive credit for the rents collected by Mamero, and the ten years he boarded him.

Mr. ARNOLD TRIPP, for the appellee:

Courts of equity will interfere when the price paid is so inadequate as to afford decisive evidence of fraud or undue influence. 1 Story's Eq. sec. 246; *Underhill* v. *Harwood,* 10 Ves. 209; *Copes* v. *Middleton,* 2 Mad. 556; *McArter* v. *Engart,* 13 Ill. 242.

Fraudulent intent may be found from the acts of the purchaser after the sale. *Brown* v. *Schuler,* 41 Ill. 192.

Here is presented not only a case where the price paid for the note is grossly inadequate, but also a case where the appellant has obtained a note of $3000, and gives nothing in return,—a total want of consideration,—and therefore a much stronger case for equity intervention than where the question of gross inadequacy of price is presented.

The very fact that appellant failed to carry out his contract, and so soon after obtaining the note, openly declares the property to be his, and that he owes appellee nothing, and tells him to get out of his house, may well be taken as an attempt on the part of appellant to fraudulently appropriate the note to his own use, and that, when he obtained the note, he never intended to give appellee anything, but to swindle

him out of his property. Such a transaction, if allowed to stand, would be unconscionable and unjust.

In the case of *Frazier* v. *Miller*, 16 Ill. 48, the complainant gave all his property to the defendant, on condition that the defendant would support complainant and his wife during life, the defendant giving bond to that effect, but afterward obtaining the bond from the complainant, he refused to carry out his contract, and maltreated the complainant and his wife. This court held that he might proceed in chancery to have the conveyance rescinded. See, also, *Bard* v. *Bard*, 59 Ill. 46; *Rockafellow* v. *Newcomb*, 57 id. 186; *Jones* v. *Neeley*, 72 id. 449.

Mr. JUSTICE MULKEY delivered the opinion of the Court:

Franz Mamero and wife, by deed bearing date February 28, 1874, conveyed to their son-in-law, William Henschel, a house and lot on Sedgwick street, Chicago, being the premises now in controversy. The consideration, as expressed in the deed, was $3000, though nothing in fact was paid. The day before the deed was recorded, to-wit, on the 2d of March, 1874, Henschel executed to Mamero his two promissory notes, one for $1000, and the other for $2000, and both payable three years after date, with interest at the rate of ten per cent per annum. These notes were secured by separate trust deeds on the premises, executed by Henschel and wife to Gustavus Troost, as trustee. By deeds of release, respectively bearing date February 24, 1877, and September 22, 1881, said trust deeds were released, and the deeds of release, on the day last named, were placed on record. On the same day there was filed for record a trust deed bearing date September 13, 1881, executed by Henschel and wife, conveying the premises in question to Conrad Niehoff, to secure Henschel's note to Mamero, of same date therewith, for the sum of $3000, due three years after date, with interest at six per cent per annum, payable half-yearly.

It was agreed at the time of this transaction, as it was when the former notes and trust deeds were executed, that Mamero should have control of the property, collect rents, etc., until Henschel should pay the note last above mentioned, and that upon such payment the property was to be his. Nothing being paid upon the notes, Mamero continued to control the property, collect rents, etc., as he always had before, until in June, 1883, when, on the occasion of a difficulty between Mamero and one Zipprich, in respect to certain alterations and improvements which the latter had contracted to make in the house on the premises, and which Mamero and Henschel did not then want made, it was concluded, after consultation with counsel, that for the purpose of preventing the enforcement of Mamero's improvident agreement with Zipprich, the note held by the former against Henschel should be cancelled, the trust deed to Niehoff released, and that thereafter Henschel should collect the rents, so that he might appear the obsolute owner of the property. As an additional inducement to consummate this scheme, Mamero's great age was pressed upon him as a reason why he should not have the care and responsibility of looking after the property, and with a like purpose he was assured that the rents, after payment of taxes, etc., should be paid over to him during life, and, if necessary, the property itself should be applied to his support whenever he requested it. On his death, however, the property, or whatever was left of it, was to go to Henschel. This agreement, which was at once carried into effect, was brought about, in a large degree, by the active coöperation of Henschel. The note was cancelled and the trust deed released without Mamero's receiving a cent from Henschel, or any one else. All he received was Henschel's hollow verbal promises, which he now repudiates. At the time of this last transaction Mamero was seventy or seventy-one years of age, and it may well be presumed that his advanced age had much to do with his entering into so unwise and improvident an

arrangement, which stripped him of the means of support, and placed him at the mercy of one who has proved faithless to the trust reposed in him.

Some time before the filing of the present bill, Henschel commenced threatening to sell the property and go to Europe, and proposed taking Mamero along with him. The latter declined to go, and Henschel then told him he (Henschel) should keep the property, and ordered Mamero to leave his house, which he did, and shortly thereafter filed in the Superior Court of Cook county the present bill, praying that the original deed from Mamero to Henschel be so reformed as to conform to the intentions of the parties, but in the event that could not be done, the release of the 22d of September, 1881, be set aside, and that the deed of trust to Niehoff be foreclosed, etc. The Superior Court, on the hearing, entered a decree dismissing the bill, which, on Mamero's appeal, was reversed by the Appellate Court for the First District, and the cause was remanded, with directions to the Superior Court "to enter a decree setting aside the cancellation of said note and vacating the release of the deed of trust, and for a foreclosure of the deed of trust, and for a sale of the mortgaged premises for the amount appearing to be due on said note."

The question to be determined here is, whether the judgment and order of the Appellate Court are warranted by the facts appearing in the record, and which are, in brief, as above stated. This question must be answered in the affirmative. To solve it otherwise would be to hold that equity is powerless to prevent the consummation of a palpable fraud, resulting in the grossest injustice. That appellee had a valid mortgage on the property in question for $3000 or more, on the 22d of September, 1881, that he was induced to release the mortgage and cancel the evidence of the debt by appellant's express agreement that appellee should enjoy the rents, issues and profits of the premises during his life, and that he should even have the property itself sold and the proceeds

applied to his own use, if he required it, is clearly shown by the decided weight of the evidence. We are also of opinion that the facts and circumstances shown fairly justify the inference that the promises and assurances made by Henschel to Mamero, in respect to the property, were so made without any intention of performing them, and this being so, the Statute of Frauds clearly has no application to the case. In addition to all this, it is evident, from the transactions between the parties, that appellee never intended to part with the use and enjoyment of the premises during his life without being paid the amount of his mortgage, and his mortgage was released upon this express understanding. Having repudiated his agreement, the only consideration for the release, why may not equity, for the purpose of preventing a failure of justice, treat the mortgage as still existing, and thus place the parties in the same position as they were before the transaction occurred? It is said in 4 Wait's Actions and Defences, page 548: "Equity will keep an incumbrance alive, or consider it extinguished, as will best serve the ends of justice and the actual, just intent of the parties,"—citing *Goulding* v. *Bunster,* 9 Wis. 513; *Champney* v. *Cooper,* 32 N. Y. 543.

This well recognized principle of equity finds illustration in many well considered cases, under a great variety of circumstances. Thus, in *Hale* v. *Morgan,* 68 Ill. 244, where the holder of the mortgage, through his agent, had delivered a release thereof to the assignee of the equity of redemption, on the verbal promise of the latter that he would pay the balance due on the mortgage in a short time, and afterwards refused to do so, it was held, the mortgage might be foreclosed notwithstanding the release. Indeed, it is a general principle that a release or discharge of a mortgage obtained through mistake or fraud, will, as between the parties, be held inoperative, and no defence to its foreclosure. 2 Jones on Mortgages, sec. 966.

Closely allied to this principle is the one upon which courts of equity act in treating the holder of the legal title to property wrongly obtained, as a mere trustee of the rightful owner. Thus it is said in 2 Pomeroy's Equity, sec. 1055: "A second well settled and even common form of trusts *ex malificio*, occurs whenever a person acquires the legal title to land or other property by means of an intentionally false and fraudulent verbal promise to hold the same for a certain specified purpose, as, for example, a promise to convey the land to a designated person, or to reconvey it to the grantor, and the like." In all such cases, equity fastens a trust upon the property itself, and follows it into the hands of the wrongful owner.

Looking at the subsequent conduct of the appellant, there is but little doubt that his promises to appellee, by which the latter was induced to cancel the note and release the trust deed, were made with the intention of never performing them. If so, whatever property rights he thereby acquired at law, were held by him, in equity, in trust for appellee.

Without prolonging the discussion, suffice it to say, we are fully satisfied with the conclusion reached in this case by the Appellate Court, as well as the grounds upon which it is rested. The view we have taken of it is sustained, with more or less directness, by the following cases: *Frazier* v. *Miller*, 16 Ill. 48; *Rockafellow* v. *Newcomb*, 57 id. 186; *Oard* v. *Oard*, 59 id. 46; *Jones* v. *Neely*, 72 id. 449.

The judgment will be affirmed.

*Judgment affirmed.*